# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

CHRISTOPHER BLOOD and WENDY
BLOOD; JEFF BROCKMEYER and
ANN BROCKMEYER; DEAN
DAUBER and TANYA DAUBER; and
SUE KOHL, Individually and on behalf
of all others similarly situated,

                Plaintiffs,

vs.

GIVAUDAN FLAVORS
CORPORATION, a Delaware Corp.,
f/k/a Givaudan-Roure Corp., and also as
Givaudan-Roure Flavors Corp. and also
f/k/a Tastemaker Corp., and also as Fries
& Fries, Inc., and also as Mallinckrodt
Foods & Flavors, Inc. and also as
Mallinckrodt Flavor & Fragrances, Inc.,
and as a partner in the partnership
Tastemaker; FIRMENICH
INCORPORATED, a Delaware
Corporation; SYMRISE INC., a New
Jersey Corporation; and JOHN DOE
DEFENDANTS 1-20,

                Defendants.

No. C07-142-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING DEFENDANT
GIVAUDAN FLAVORS
CORPORATION'S MOTION TO
DISMISS COUNT II AND
DEFENDANT SYMRISE INC.'S
MOTION TO DISMISS COUNT IV**

_____

## TABLE OF CONTENTS

*I.  INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
*B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*A. Rule 12(b)(6) Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*B. Pleading Fraud With Particularity* . . . . . . . . . . . . . . . . . . . . . 18
     *1. Pleading fraud under Rule 9(b)* . . . . . . . . . . . . . . . . . . . 18
     *2. Application of the Rule 9(b) pleading standards* . . . . . . . . 21

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## *I. INTRODUCTION AND BACKGROUND*

### *A. Procedural Background*

On December 13, 2007, plaintiffs Christopher Blood and Wendy Blood ("the Bloods"), Jeff Brockmeyer and Ann Brockmeyer ("the Brockmeyers), Dean Dauber and Tanya Dauber ("the Daubers"), and Sue Kohl filed their Complaint against defendants Givaudan Flavors Corp. ("Givaudan"), Firmenich Incorporated ("Firmenich"), Symrise Inc. ("Symrise"), and twenty John Doe defendants alleging five causes of action. The five causes of action asserted are for negligence against all defendants (Count I), fraudulent concealment against defendant Givaudan (Count II), fraudulent concealment against defendant Firmenich (Count III), fraudulent concealment against defendant Symrise (Count IV, and a combined claim for loss of consortium and medical expenses against all

defendants (Count V).  The Complaint alleges that this court has subject matter jurisdiction by virtue of diversity of citizenship of the parties, 28 U.S.C. § 1332.

Defendants Givaudan and Symrise have each filed motions to dismiss the fraudulent concealment claims against them found in Counts II and IV, respectively, in the Complaint (Doc. Nos. 9 and 23).   Because the grounds raised in both defendant's respective motions to dismiss are identical, the court will generally refer to both motions to dismiss as defendants' motions.  Specifically, defendants assert that plaintiffs' fraudulent concealment claims against them should be dismissed for failure to plead fraud with particularity.  Plaintiffs have filed timely resistances to defendants' motions.  Defendants, in turn, have filed reply briefs in support of their respective motions.

## B.  Factual Background

On a motion to dismiss, the court must assume all facts alleged in the plaintiffs' Complaint are true, and must liberally construe those allegations.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 990 (8th Cir. 2007).  Therefore, the following factual background, related to Counts II and IV, is drawn from the plaintiffs' Complaint in such a manner.

Christopher Blood and Wendy Blood reside in Linn County, Iowa.  Christopher was employed by General Mills Corporation ("General Mills") at its popcorn packaging facility in Iowa City, Iowa, from October 1997 to April of 2005.  Jeff Brockmeyer and Ann Brockmeyer also reside in Linn County, Iowa.  Jeff worked at General Mills's popcorn packaging plant in Iowa City from 1993 to 2005.  Dean Dauber and Tanya Dauber reside in Johnson County, Iowa.  Dean was employed at General Mills's popcorn packaging facility in Iowa City from 1993 until July 2005.  Sue Kohl resides in Johnson County,

Iowa, and also worked at General Mills's popcorn packaging plant in Iowa City. Sue worked there from 1993 to 2002.

Defendant Givaudan is a Delaware corporation with its principal place of business in Cincinnati, Ohio. Defendant Givaudan is the owner and operator of a flavoring plant in Cincinnati, Ohio. Defendant Givaudan was known as Mallinckrodt Flavors & Fragrances, Inc. from 1988 until 1990 when it changed its corporate name to Fries & Fries, Inc. Between 1992 and 1997, Givaudan was a general partner in a partnership called Tastemaker, which operated the flavoring plant. Givaudan went by the name Fries & Fries, Inc. until April 1997, when it changed its name to Givaudan-Roure Flavors Corporation. In 2000, Givaudan's name was changed to its current name.

Defendant Symrise is a New Jersey corporation with its principal place of business in Teterboro, New Jersey. Defendant Firmenich is a Delaware corporation with its principal place of business in Plainsboro, New Jersey. Defendants Firmenich, Givaudan and Symrise each design, manufacture, market and distribute natural and artificial butter flavorings. Defendants sold their butter flavorings for use in General Mills's Iowa City popcorn packaging plant. General Mills manufactures microwave popcorn that it markets and sells under the name Pop Secret. General Mills used Givaudan, Firmenich, and Symrise natural and artificial butter flavorings in its popcorn plant in Iowa City.

Defendants' natural and artificial butter flavorings contain the compound diacetyl and other compounds that volatilize during the preparation and use of the oil and flavor mix during the microwave popcorn packaging process. Exposure to these flavoring compounds causes damage to the respiratory systems of popcorn workers in the form of asthma, bronchiectasis, bronchiolitis obliterans, chronic bronchiolitis, chronic obstructive bronchitis, chronic cough, chronic obstructive pulmonary disease, emphysema, fatigue, obstructive spirometry abnormalities, severe lung impairment, and shortness of breath.

Defendants knew or should have known of the hazardous nature of their natural and artificial butter flavorings at the time of sale and when plaintiffs were exposed to such products while working at the General Mills facility and were injured. Defendants failed to warn of the danger associated with exposure to their butter flavorings products, and failed to give instructions regarding the safe use of these products and the necessary precautions to take concerning such products. As a result of defendants' failure to provide such warnings and failure to give such instructions, plaintiffs did not know or appreciate the hazard posed by defendants' natural and artificial butter flavorings. Plaintiffs' exposure to defendants' natural and artificial butter flavorings caused damage to plaintiffs' lungs and/or respiratory system.

With respect to their fraudulent concealment claim against defendant Givaudan, plaintiffs allege the following:

28.     The Flavors and Extract Manufacturers Association ("FEMA") is and/or was at all times relevant herein, a trade association for flavoring manufacturers, with members including Givaudan, Symrise, and Firmenich. In 1985 FEMA members had access to and did use a database that identified hazards in flavor chemicals. An ingredient data sheet for diacetyl described the chemical as hazardous and capable of producing systemic toxicity.

29.     In 1985, the National Institute for Occupational Safety and Health (NIOSH) conducted a Health Evaluation of the International Bakers Services plant in Indiana. The report, published in 1986, stated that two gentlemen employed at the plant using food flavors were diagnosed as having lung injuries clinically consistent with bronchiolitis obliterans.

30.     Givaudan knew by 1986 that diacetyl was identified as a chemical that had caused or contributed to cause bronchiolitis obliterans when it was named as a defendant in

Spaulding v. AAPER, et al., Circuit Court of Marshall County, Indiana, Case No. CTC 86-117, filed April 15, 1986 and Kois v. Aceto Chemical Co., et al., Circuit Court of Marshall County, Indiana, Case No. CTC 86-200. The plaintiffs in both actions alleged to have suffered from lung disease from exposure to chemicals at the International Bakers Services plant described above. Among the chemicals identified in the action as having caused or contributed to cause lung injury to plaintiffs Spaulding and Kois was diacetyl. Givaudan was represented by counsel in both lawsuits.

31. In or around 1991, Givaudan knew that one or more of its employees at its Cincinnati plant had been diagnosed with bronchiolitis obliterans and that one of the employees, J.M., died as a result of her injury.

32. As early as 1992, Givaudan knew that precautions should be taken when working around diacetyl. Givaudan required its employees to wear a full face respirator in any room containing liquid diacetyl or a mixture containing diacetyl. Givaudan also instructed its employees to "avoid heating" the diacetyl. A respirator was required at all times if mechanical ventilation was not connected to the mixing tank or was unavailable.

33. By 1992, Givaudan became aware of another case of bronchiolitis obliterans within its Cincinnati plant J.W. and a potential case, C.W.

34. As early as 1993, Givaudan believed, based on its internal investigation, that diacetyl could be a cause of bronchiolitis obliterans to its employees and that diacetyl should be studied because of this belief.

35. In 1994, Givaudan retained Dr. Stuart Brooks, an occupational medicine specialist. Dr. Brooks confirmed the diagnosis of bronchiolitis obliterans in two employees and

recommended steps to continue the investigation to determine the cause and prevent exposure to other Givaudan employees.

36. Following receipt of Dr. Brooks' proposal, Givaudan fired Dr. Brooks, thereby preventing Dr. Brooks' recommended investigation into the cause of the epidemic.

37. In 1993, Givaudan employees acknowledged internally that if Givaudan found there was a specific health hazard present in its Cincinnati facility, that information would have to be shared with the affected and potentially affected employees, but if no specific hazard was found, then no disclosure would have to be made.

38. In 1994, Givaudan retained specialists from the University of Cincinnati to investigate the lung disease among Givaudan employees. The specialists included, Dr. Roy McKay, a pulmonary toxicologist, Dr. James Lockey, an occupational medicine physician, and Dr. Susan Pinney, an epidemiologist. Each was required to sign a confidentiality agreement with Givaudan.

39. Dr. McKay, the pulmonary toxicologist hired by Givaudan, was qualified to investigate the cause of the lung disease at Givaudan's plant and asked Givaudan to allow him to make that investigation. Givaudan refused the request and required that the pulmonary toxicologist conduct breathing tests only. Givaudan also instructed Dr. McKay to never use the words "bronchiolitis obliterans" when speaking to Givaudan employees.

40. Dr. Pinney, the epidemiologist hired by Givaudan, was qualified to conduct a statistical analysis of the outbreak of lung disease at the plant and the chemicals used. She began compiling data to make that analysis. Givaudan elected not to complete the epidemiologist's research.

41.     By May 1995, Givaudan re-familiarized itself with the 1986 NIOSH report and findings of bronchiolitis obliterans at the International Bakers plant in Indiana.  In 1995, Givaudan compared chemicals used at Givaudan to chemicals used at the International Bakers Services plant and determined that only three chemicals matched, one of which was diacetyl.  Despite these findings, Givaudan did not disclose to the National Institute for Occupational Safety and Health that it had also experienced cases of bronchiolitis obliterans at its plant.

42.     Dr. Lockey, the occupational medicine specialist hired by Givaudan, examined numerous employees of Givaudan and requested records of others.  Between 1995 and 1996, Dr. Lockey accepted or confirmed the diagnoses of bronchiolitis obliterans in eight Givaudan employees, including J.M., C.W., R.G. R.F., G.S., W.V., M.S.M., and J.W.  But for the confidentiality agreement, Dr. Lockey would have reported his findings and experience at the Cincinnati plant to the medical community.

43.     Between 1995 and 1996, several Givaudan employees filed workers' compensation claims alleging that they suffered from bronchiolitis obliterans.  Such employees also filed claims alleging that Givaudan had violated Ohio Safety Regulations.

44.     In late summer or fall 1996, Givaudan employees, including its president, general counsel, toxicologist, and occupational medicine consultant, Dr. Lockey, met on one or more occasions with representatives of FEMA and disclosed to FEMA that one Givaudan employee had been diagnosed with bronchiolitis obliterans and that one or more flavoring chemicals may cause bronchiolitis obliterans.  Mike Davis, Givaudan's president, was also a board member of FEMA at the time of these meetings with FEMA.  Givaudan did not disclose to FEMA the full extent of

lung injury among its employees, that it had been investigating lung injury at its plants since 1993, or that it had refused requests from experts to investigate the cause of that lung disease. Givaudan told FEMA not to disclose to other FEMA members that it was Givaudan who experienced cases of bronchiolitis obliterans in its plant because of its fear that Givaudan's competitors would disclose this information to Givaudan's customers, thereby taking flavor ingredient sales from Givaudan.

45.     As a result of the meeting with Givaudan, FEMA told the FEMA Board of Governors about bronchiolitis obliterans in a flavoring plant. FEMA then sponsored an April 1997 seminar called "Respiratory Safety in the Flavor and Fragrance Workplace." Executives of Symrise and Firmenich then served on the FEMA board. Givaudan did not discuss or disclose the outbreak of bronchiolitis obliterans at its own plant during this FEMA board or committee meeting.

46.     At the April 1997 seminar, the disease bronchiolitis obliterans was discussed, as well as its causes and necessary precautions to prevent the disease. The NIOSH study of the International Bakers plant was also discussed and the NIOSH report was produced with the seminar materials to all attendees.

47.     The invitation to the April 1997 FEMA seminar stated, "Exposure to respiratory irritants without proper safety procedures may cause severe permanent injury."

48.     The attendees of the April 1997 seminar heard from Cecille Rose, M.D. an occupational medicine physician from the National Jewish Health Center and John Martyny a certified industrial hygienist also of National Jewish. Rose educated the attendees on lung function, occupational lung disease including irritant chemicals. Martyny educated the attendees on respiratory protection, ventilation and drafting of

material safety data sheets. FEMA also included in the seminar materials the NIOSH Health Hazard Evaluation of the International Bakers Services Plant referenced above.

49. Givaudan employees John Hochstrasser, Nazer Ali, David Johnson, James LaMarta, Chet Makowski, Tracy Orecchio, Steve Semoff, Andrew Stofa, and Michael Trumpf either attended or were registered to attend the 1997 FEMA seminar.

50. General Mills employees began experiencing skin irritation problems in the mid-1990's.

51. To investigate the skin irritation problem, General Mills contacted Givaudan for advice on butter flavor products and industrial hygiene. General Mills contacted Givaudan because General Mills initially believed Givaudan's powdered butter flavoring may be the cause of the skin irritation issues.

52. General Mills employees went to the Givaudan plant in Cincinnati on two more occasions specifically to address the skin irritation issue.

53. On at least two occasions Givaudan employees, including but not limited to an industrial hygienist and mechanical engineer, went to the General Mills plant specifically to address the health issue.

54. General Mills took affirmative steps to reduce exposures to reduce the skin irritation problem. One of the steps that General Mills took to reduce the skin irritation problem was to have Givaudan reformulate the Givaudan powdered butter flavor by converting it into an oil based product which should thereby, in theory, reduce the opportunity for dusting and, in turn, reduce the opportunity of skin exposure. That change did not eliminate the skin

irritation problem so General Mills had Givaudan change the formula again to make the product a slurry, again to reduce skin exposures. Givaudan did not tell General Mills that the change from powder to slurry, while decreasing skin exposure, increased the risk of inhalation exposure.

55.    Givaudan advised General Mills on how to protect workers from skin irritation but never told General Mills about the bronchiolitis obliterans injuries that Givaudan employees had experienced: that Givaudan employees with bronchiolitis obliterans had complained of breathing problems while working with diacetyl and butter flavor; that Givaudan always required respirators while working with diacetyl; or that Givaudan told its Cincinnati employees not to heat diacetyl.

56.    General Mills asked Givaudan if inhaling butter flavoring was hazardous and was told no.

* * * *

63.    Givaudan knew that the Plaintiffs and General Mills would regard the matters Givaudan concealed or omitted to be important in determining, on their own, the safety precautions required to be taken by the Plaintiffs in the course of their employment.

64.    The knowledge Givaudan concealed or omitted as described herein was material to the Plaintiffs because the health hazards of its butter flavors caused the Plaintiffs to develop severe respiratory disease and, had they knew [sic] of the health hazards, they or General Mills would have taken necessary precautions to avoid or limit exposure to butter flavorings.

65.    The Plaintiffs could not have discovered the truth through a reasonable inquiry or inspection, or were prevented from making a reasonable inquiry or inspection, and relied

upon the silence as representation that the material facts found herein did not exist. In the alternative, the Plaintiffs reasonably and detrimentally relied on Givaudan's fraudulent concealment and omissions by not acting to protect themselves from the dangers associated with Givaudan's butter flavors through the use of, inter alia, NIOSH-approved respirators, better ventilation and/or those precautions Givaudan required of its own employees. In the alternative, Plaintiffs were reasonably justified in not acting and could not have discovered and/or was prevented from discovering the truth because Givaudan created a false sense of security with its concealment and silence.

66. The concealed information found herein was such that the Plaintiffs would have acted differently had they been aware of it; specifically had the Plaintiffs known of the health hazards, they or General Mills would have taken necessary precautions to avoid or limit exposure to butter flavorings through the use of, inter alia, NIOSH-approved respirators, better ventilation and/or those precautions Givaudan required of its own employees. The Plaintiffs reasonably relied upon the fact that Givaudan should [sic] fulfill its duties and did believe that Givaudan would fulfill its duties as described herein.

Complaint at ¶¶ 28-56, 63-66.

With respect to their fraudulent concealment claim against defendant Symrise, plaintiffs allege the following:

95. Symrise had full access to the information shared during the 1997 FEMA Conference. Symrise employees, including Klaus Bauer, Mervyn Brown, Salvatore Cascone, Lawrence Dickinson, Thomas Karnis, Phillip Mingle, James Olano, Luis Olano, Jesus Pardo, Mohan Pradhan, Gene Rachelski and Andreas Swoboda either attended or were registered to attend the 1997 FEMA Conference on Respiratory Safety in the Workplace.

96.     Symrise employees, including Klaus Bauer, received and reviewed the 1997 FEMA Conference seminar materials, and were fully aware that there was a possible case of bronchiolitis obliterans at a FEMA member plant and two cases of bronchiolitis obliterans at the International Bakers plant.

97.     Klaus Bauer was head of FEMA's Flavor Ingredient Committee in 1997.

98.     Among the Standing Committees of FEMA is the Safety Evaluation Coordination Committee. The responsibility of the FEMA Safety Evaluation Coordination Committee is:

> To direct and oversee safety evaluation activities of the Association, and to monitor safety evaluation activity, wherever it occurs related to flavors. To initiate or cooperate in initiating in activities related to and supporting competent and effective safety evaluation of flavors. To coordinate the safety evaluation activities of the Board of Governors, the Expert Panel, other committees of the Association, and outside organizations including governmental agencies, scientific and academic institutions and other industry groups.

99.     Symrise employee Klaus Bauer was, at all pertinent times, the Chairman of the FEMA Flavor Ingredients Committee.

100.    Klaus Bauer never directed the FEMA Flavor Ingredient Committee or Symrise to do any kind of health study for inhalation purposes of any of the chemicals that were being used by FEMA members.

101.    By the end of the April 1997 FEMA seminar, Symrise had knowledge that there was a possible case of bronchiolitis obliterans at a FEMA member plant and two cases of bronchiolitis obliterans at the International Bakers plant and that exposure to irritant chemicals can cause severe lung injury.

102.    Symrise did not advise General Mills of the information that it learned at the FEMA conference or specifically state that irritating chemicals such as diacetyl could cause severe permanent lung injury.  Nor did Symrise change its material safety data sheets.

103.    Following the FEMA conference Symrise performed no investigation to determine if any chemicals that it was using could cause bronchiolitis obliterans.

* * * *

111.    Symrise knew that the Plaintiffs and General Mills would regard the matters Symrise concealed or omitted to be important in determining, on their own, the safety precautions required to be taken by the Plaintiffs in the course of their employment.

112.    The knowledge Symrise concealed or omitted as described herein was material to the Plaintiffs because the health hazards of its butter flavors caused the Plaintiffs to develop severe respiratory disease and, had they knew [sic] of the health hazards, they or General Mills would have taken necessary precautions to avoid or limit exposure to butter flavorings.

113.    The Plaintiffs could not have discovered the truth through a reasonable inquiry or inspection, or were prevented from making a reasonable inquiry or inspection, and relied upon the silence as representation that the material facts found herein did not exist.   In the alternative, the Plaintiffs

reasonably and detrimentally relied on Symrise's fraudulent concealment and omissions by not acting to protect themselves from the dangers associated with Symrise's butter flavors through the use of, inter alia, NIOSH-approved respirators, better ventilation and/or those precautions Symrise required of its own employees. In the alternative, Plaintiffs were reasonably justified in not acting and could not have discovered and/or was prevented from discovering the truth because Symrise created a false sense of security with its concealment and silence.

114. The concealed information found herein was such that the Plaintiffs would have acted differently had they been aware of it; specifically had the Plaintiffs known of the health hazards, they or General Mills would have taken necessary precautions to avoid or limit exposure to butter flavorings through the use of, inter alia, NIOSH-approved respirators, better ventilation and/or those precautions Symrise required of its own employees. The Plaintiffs reasonably relied upon the fact that Symrise should [sic] fulfill its duties and did believe that Symrise would fulfill its duties as described herein.

Complaint at ¶¶ 95-103, 111-114.

## II. LEGAL ANALYSIS

### A. Rule 12(b)(6) Standards

The legal standards governing a motion to dismiss are often cited and are well-known to this court. Two recent developments, however, have altered the legal landscape concerning the court's analysis of a motion to dismiss. The most recent development is purely cosmetic. Effective December 1, 2007, Federal Rule of Civil Procedure 12 was "amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules." Fed. R.

Civ. P. 12 advisory committee's note. The advisory committee notes make it clear that the "changes are to be stylistic only." *Id*. The stylistic changes to Rule 12(b)(6) are in fact minimal, as Rule 12(b)(6) remains the domain of the defense "for failure to state a claim upon which relief can be granted." *Id*. 12(b)(6). Thus, the court need not alter its well known review of the pending motion to dismiss as a result of the recent amendment.

However, the Supreme Court's decision, *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), requires the court to modify its substantive review of the motion to dismiss. Prior to *Bell Atlantic*, the Eighth Circuit Court of Appeals stated:

> The standard for a district court to employ in ruling on a motion to dismiss is clear. A district court must accept the allegations contained in the complaint as true, and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party. Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief.

*Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004) (emphasis added) (internal citations and quotations omitted); *see Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief." (emphasis added)). In *Bell Atlantic*, the Court retired the generous and often disparaged "no set of facts" language because it permitted an "approach to pleading [that] would dispense with any showing of a reasonably founded hope that a plaintiff would be able to make a case." 127 S. Ct. at 1968-69. The Eighth Circuit Court of Appeals has discussed the Supreme Court's decision in *Bell Atlantic* in only two decisions. *Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th cir. 2008); *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008). Fortunately,

other Circuit Court of Appeals have elaborated on *Bell Atlantic*. *E.g.*, *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (2d Cir. 2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).

Under *Bell Atlantic*, it is now understood that complainants have an obligation to provide the grounds of their entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 127 S. Ct. at 1964-65. "The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief." *Benton*, 524 F.3d at 870; *see Schaaf*, 517 F.3d at 549 ("The plaintiffs need not provide specific facts in support of their allegations, but they must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level.") (citation omitted); *see also Killingsworth*, 507 F.3d at 618 ("[T]he factual allegations in the complaint 'must be enough to raise a right to relief above the speculative level.'") (quoting *Bell Atlantic*, 127 S. Ct. at 1965). Otherwise, the complainant fails to state a claim upon which relief can be granted because they "have not nudged their claims across the line from conceivable to plausible." *Bell Atlantic*, 127 S. Ct. at 1974. Thus, the complaint must contain "enough facts to state a claim to relief that is plausible on its face," although it does not have to contain "fact pleading of specifics." *Id.*; *see Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) ("Specific facts are not necessary [under Federal Rule of Civil Procedure 8(a)(2)."); *Airborne Beepers & Video, Inc. v. AT&T Mobility L.L.C.*, 499 F.3d 663, 667 (7th Cir. 2007) (noting *Erickson* made it clear "that [*Bell Atlantic v.*] *Twombly* did not signal a switch to fact-pleading in the federal courts"). Finally, although *Bell Atlantic* might have done away with the "no set of facts" language, it did not change the requirement that "when ruling on a motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 127 S. Ct. at 2200; *see,*

*e.g.*, *Gross v. Weber*, 186 F.3d 1089, 1090 (8th Cir. 1999) ("On a motion to dismiss, we review the district court's decision de novo, accepting all the factual allegations of the complaint as true and construing them in the light most favorable to [the non-movant].") With these standards in mind, the court turns to consideration of defendants Givaudan and Symrise's respective motions to dismiss Counts II and IV.

### B.  Pleading Fraud With Particularity

Defendants Givaudan and Symrise both assert that plaintiffs have failed to plead their fraudulent concealment claims with sufficient particularity as required by Federal Rule of Civil Procedure 9(b),[1] and, therefore, have failed to state a claim upon which relief can be granted.  Plaintiffs counter that their fraudulent concealment claims are sufficient to meet the standards of Rule 9(b).  The court, therefore, must determine whether plaintiffs have pleaded their fraudulent concealment claims with sufficient particularity in their Complaint.

### 1.     Pleading fraud under Rule 9(b)

This court has articulated the standards for pleading fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure in a number of prior decisions.  *See Remmes v. International Flavors & Fragrances, Inc.*, 389 F. Supp. 2d

---

[1] Federal Rule of Civil Procedure Rule 9(b) provides as follows:

> (b)  **Fraud, Mistake, Condition of the Mind**.  In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

FED. R. CIV. P. 9(b).

18

1080, 1087-88 (N.D. Iowa 2005); *Schuster v. Anderson*, 378 F. Supp. 2d 1070, 1086 (N.D. Iowa 2005); *Iowa Health Sys. v. Trinity Health Corp.*, 177 F. Supp. 2d 897, 914 (N.D. Iowa 2001); *Wright v. Brooke Group, Ltd.*, 114 F. Supp. 2d 797, 832-33 (N.D. Iowa 2000); *Doe v. Hartz*, 52 F. Supp.2d 1027, 1055 (N.D. Iowa 1999); *Brown v. North Cent. F.S., Inc.*, 987 F. Supp. 1150, 1155-57 (N.D. Iowa 1997); *Brown v. North Cent. F.S., Inc.*, 173 F.R.D. 658, 664-65 (N.D. Iowa 1997); *North Cent. F.S., Inc. v. Brown*, 951 F. Supp. 1383, 1407-08 (N.D. Iowa 1996); *DeWit v. Firstar Corp.*, 879 F. Supp. 947, 970 (N.D. Iowa 1995). Thus, only a brief discussion of these matters is required here.

Rule 9(b) of the Federal Rules of Civil Procedure "'requires a plaintiff to allege with particularity the facts constituting the fraud.'" *Brown*, 987 F. Supp. at 1155 (quoting *Independent Business Forms v. A-M Graphics*, 127 F.3d 698, 703 n.2 (8th Cir. 1997)). "'When pleading fraud, a plaintiff cannot simply make conclusory allegations.'" *Id.* (quoting *Roberts v. Francis*, 128 F.3d 647, 651 (8th Cir.1997)). Rather, Rule 9(b) requirements "'means the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, (8th Cir. 2007) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941 (1990)). In *Commercial Property Inv., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639 (8th Cir. 1995), the Eighth Circuit Court of Appeals explained:

> Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." "'Circumstances' include such matters as the time, place and content of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982), *adhered to on reh'g*, 710 F.2d 1361 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S. Ct.

> 527, 78 L. Ed.2d 710 (1983). Because one of the main
> purposes of the rule is to facilitate a defendant's ability to
> respond and to prepare a defense to charges of fraud,
> *Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir. 1985),
> conclusory allegations that a defendant's conduct was
> fraudulent and deceptive are not sufficient to satisfy the rule.
> *In re Flight Transp. Corp. Sec. Litig.*, 593 F. Supp. 612, 620
> (D. Minn. 1984).

*Commercial Property*, 61 F.3d at 644; *see United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) ("To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result."); *Roberts*, 128 F.3d at 651 (noting that factors a court should examine in determining whether the "circumstances" constituting fraud are stated with particularity under Rule 9(b) "include the time, place, and contents of the alleged fraud; the identity of the person allegedly committing fraud; and what was given up or obtained by the alleged fraud."). However, the Eighth Circuit Court of Appeals has also noted that this rule of pleading is to be interpreted "'in harmony with the principles of notice pleading.'" *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002) (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001)). That is, "[a]lthough a pleading alleging fraud need not provide anything more than notice of the claim, it must contain 'a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct.'" *Id.* (quoting *Abels*, 259 F.3d at 920).

## 2. *Application of the Rule 9(b) pleading standards*

This court noted in *Remmes v. International Flavors & Fragrances, Inc.*, 453 F. Supp.2d 1058, 1072 (N.D. Iowa 2006), another case involving similar claims related to the inhalation of butter flavorings products, that a plaintiff making a fraudulent concealment claim usually will be required to allege with particularity the following:

> "(1) the relationship or situation giving rise to the duty to speak, (2) the event or events triggering the duty to speak, and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what those defendant(s) gained by withholding information, (6) why plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance."

*Id.* (quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 202 (M.D.N.C. 1997)); *see Bear Hollow, L.L.C. v. Moberk, L.L.C.*, No. 5:05CV210, 2006 WL 1642126, at *4 (W.D.N.C. June 5, 2006) (citing *Breeden*, 171 F.R.D. at 202); *Hill v. Brush*, 383 F. Supp.2d 814, 823 n.11 (D. Md. 2005) (same). Here, both defendant Givaudan and Symrise argue that plaintiffs have failed to plead the elements of duty and reliance with sufficient particularity. Therefore, the court will focus its attention on those two elements.

In determining whether a manufacturer owes a duty to warn, Iowa courts apply the principles of the Restatement (Second) of Torts § 388. *See Estate of Pearson ex rel. Latta v. Interstate Power and Light Co.,* 700 N.W.2d 333, 341 (Iowa 2005) ("We have adopted the Restatement (Second) of Torts concerning the duty to warn by persons providing products for the use of others."); *see also Broderick & Bascom Rope Co.*, 197 N.W.2d 202, 209 (Iowa 1972). Section 388 provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

RESTATEMENT (SECOND) OF TORTS § 388 (1999) (Section 388 is made applicable to manufacturers by § 394).

Here, the court concludes that plaintiffs have specifically alleged facts which, if proven at trial, would establish that defendant Givaudan had a duty to warn all foreseeable users of the known dangers of their butter flavorings products and/or their constituents. Complaint at ¶¶ 26-56, 63-66. Specifically, with respect to defendant Givaudan, plaintiffs allege the Givaudan "knew" by 1986 that diacetyl had been identified as a chemical that had caused or contributed to the development of bronchiolitis obliterans in plant workers. Complaint at ¶ 30. Plaintiffs further aver that by 1992 defendant Givaudan knew that precautions should be taken when working around diacetyl, that Givaudan required its employees to wear a full face respirator in any room containing liquid diacetyl or a mixture containing diacetyl, and that Givaudan instructed its employees to "avoid heating" the diacetyl. Complaint at ¶ 32. In addition, plaintiffs allege that even though General Mills contacted Givaudan "for advice on butter flavor products and industrial hygiene" and

General Mills specifically inquired about whether inhaling butter flavorings was hazardous, Givaudan told General Mills that inhaling butter flavorings was not hazardous in spite of the fact that workers at Givaudan had developed bronchiolitis obliterans after working with diacetyl and that its workers were required to wear respirators when working with diacetyl and that it had instructed its workers not to heat diacetyl. Complaint at ¶ 51-56. In addition, plaintiffs allege that they were exposed, through their work at General Mills' Iowa City plant, to butter flavorings products manufactured, marketed, distributed and sold by defendant Givaudan, and, as a result, they have suffered severe and permanent injury to their persons. Complaint at ¶¶ 13-14, 17. Although defendant Givaudan has identified a number of questions left unanswered in the Complaint, Rule 9(b) does not require absolute particularity. *See* 5A CHARLES ALLAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1298 (2004) ("the rule regarding the pleading of fraud does not require absolute particularity or a recital of the evidence, especially when some matters are beyond the knowledge of the pleader and can only be developed through discovery"). Rather, taking into account that because this matter is before the court on motions to dismiss, which requires the court to view the facts in the light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently alleged a legal basis upon which defendant Givaudan had a duty to disclose the known dangers of its butter flavorings to them.

Plaintiffs' allegations against defendant Symrise, however, are on a different footing. Specifically, plaintiffs have failed to allege with particularity how Symrise knew or had reason to know that its butter flavorings could cause severe lung injury. Unlike the allegations against defendant Givaudan, plaintiffs do not allege that any Symrise employees were effected by bronchiolitis obliterans. Nor do plaintiffs allege that Symrise required its employees to take specific safety precautions when working with flavoring products

containing diacetyl. Rather, plaintiffs instead allege that a Symrise employee, Klaus Bauer, received and reviewed materials from a FEMA conference held in 1997 from which he was made aware that "there was a possible case of bronchiolitis obliterans at a FEMA member plant and two cases of bronchiolitis obliterans at the International Bakers plant." Complaint at ¶ 96. What is conspicuously missing from these allegations is any mention that diacetyl was identified at the conference as the cause or likely cause of the cases of bronchiolitis obliterans mentioned at the conference. Similarly, the mere fact that Symrise's employee, Bauer, was head of FEMA's Flavor Ingredient Committee in 1997 does not, in itself, lead to the conclusion that Symrise knew or had reason to know that its butter flavorings could cause severe lung injury. The significance of Bauer's role in FEMA is significantly lessened given plaintiffs' allegations that defendant Givaudan "did not disclose to FEMA the full extent of lung injury among its employees, that it had been investigating lung injury at its plants since 1993, or that it had refused requests from experts to investigate the cause of that lung disease." Complaint ¶ 44. Therefore, the court concludes that plaintiffs have not sufficiently alleged a legal basis upon which defendant Symrise had a duty to warn owing to these plaintiffs. Accordingly, defendant Symrise's Motion To Dismiss Count IV Of Plaintiffs' Complaint is granted.

Defendant Givaudan also contends plaintiffs have failed to plead the required element of reliance with sufficient particularity. The detrimental reliance element of a fraud claim must be pleaded with particularity under Rule 9(b). *See Learning Works, Inc. v. Learning Annex, Inc.,* 830 F.2d 541, 546 (4th Cir. 1987) (in dismissing fraud claim for failure to plead reliance with particularity, the court of appeals noted that "reliance must be pleaded with particularity" ); *Gutman v. Howard Sav. Bank,* 748 F. Supp. 254, 257 (D.N.J. 1990) ("Rule 9(b) also requires that the detrimental reliance element of a fraud claim be pleaded with particularity."). Thus, plaintiffs must show that they acted upon the

fraud at issue. *See Gutman,* 748 F. Supp. at 257 (noting that "[t]o survive a 9(b) motion, plaintiff must show that he or she acted upon the fraud or misrepresentation complained of.").

With respect to defendant Givaudan concerning the issue of reliance, plaintiffs allege the following:

> 63. Givaudan knew that the Plaintiffs and General Mills would regard the matters Givaudan concealed or omitted to be important in determining, on their own, the safety precautions required to be taken by the Plaintiffs in the course of their employment.

> 64. The knowledge Givaudan concealed or omitted as described herein was material to the Plaintiffs because the health hazards of its butter flavors caused the Plaintiffs to develop severe respiratory disease and, had they knew [sic] of the health hazards, they or General Mills would have taken necessary precautions to avoid or limit exposure to butter flavorings.

> 65. The Plaintiffs could not have discovered the truth through a reasonable inquiry or inspection, or were prevented from making a reasonable inquiry or inspection, and relied upon the silence as representation that the material facts found herein did not exist. In the alternative, the Plaintiffs reasonably and detrimentally relied on Givaudan's fraudulent concealment and omissions by not acting to protect themselves from the dangers associated with Givaudan's butter flavors through the use of, inter alia, NIOSH-approved respirators, better ventilation and/or those precautions Givaudan required of its own employees. In the alternative, Plaintiffs were reasonably justified in not acting and could not have discovered and/or was prevented from discovering the truth because Givaudan created a false sense of security with its concealment and silence.

66.    The concealed information found herein was such that the Plaintiffs would have acted differently had they been aware of it; specifically had the Plaintiffs known of the health hazards, they or General Mills would have taken necessary precautions to avoid or limit exposure to butter flavorings through the use of, inter alia, NIOSH-approved respirators, better ventilation and/or those precautions Givaudan required of its own employees. The Plaintiffs reasonably relied upon the fact that Givaudan should [sic] fulfill its duties and did believe that Givaudan would fulfill its duties as described herein.

Complaint at ¶¶ 63-66.

The court concludes that plaintiffs, through these pleadings, have sufficiently pled the who, what, where, and how with respect to plaintiffs' reliance on the non-actions of Givaudan. Plaintiffs' reliance, their non-use of safety equipment and/or other safety precautions, follows from defendant Givaudan's concealment. Plaintiffs allege that, but for Givaudan's concealment of the dangers of its butter flavorings, they would have taken steps to avoid exposure to butter flavorings "through the use of, inter alia, NIOSH-approved respirators, better ventilation and/or those precautions Givaudan required of its own employees." Complaint at ¶¶ 66. Accordingly, the court concludes that plaintiffs' allegations are sufficiently particular to satisfy Rule 9(b). Therefore, the court denies defendant Givaudan's Motion To Dismiss Count II of Plaintiffs' Complaint.

## III.    CONCLUSION

For the reasons addressed above, the court concludes that plaintiffs have not plead with the particularity required by Federal Rule of Civil Procedure 9(b) with respect to their claim of fraudulent concealment against defendant Symrise. Therefore, defendant Symrise's Motion To Dismiss Count IV Of Plaintiffs' Complaint is **granted**. Count IV of

the Complaint is accordingly dismissed in its entirety. The court, however, concludes plaintiffs have plead with particularity their claim of fraudulent concealment against defendant Givaudan. Therefore, defendant Givaudan's Motion To Dismiss Count II of Plaintiffs' Complaint is **denied**.

**IT IS SO ORDERED.**

**DATED** this 9th day of March, 2009.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA